1  Cyrus M. Sanai, SB#150387
   SANAIS
2  433 North Camden Drive
   Suite 600
3  Beverly Hills, California, 90210
   Telephone: (310) 717-9840
4  cyrus@sanaislaw.com

5  Pro Se

6

7

8        UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
                              CALIFORNIA
9

10  CYRUS SANAI, an individual,              )  Case No.:
                                             )
11                      Plaintiff,           )
                                             )
            vs.                              )  **COMPLAINT  FOR:**
12                                           )
    ALEX KOZINSKI, in his personal           )
13  capacity; CATHY CATTERSON, in her        )  (1) INJUNCTIVE RELIEF FOR
    personal capacity; THE JUDICIAL          )  VIOLATION OF CONSTITUTIONAL
14  COUNCIL OF THE NINTH CIRCUIT,            )  RIGHTS ;
    an administrative agency of the United   )  (2) MANDAMUS;
15  States; MOLLY DWYER, in her              )  (3) DECLARATORY JUDGMENT;
    official capacity; SIDNEY THOMAS,        )  (4) ABUSE OF PROCESS (FEDERAL
16  in his official and personal capacities; )  LAW);
    PROCTOR HUG JR., in his personal         )  (5) MALICIOUS PROSECUTION
17  capacity; M. MARGARET                    )  (FEDERAL LAW);
    MCKEOWN, in her personal capacity;       )  (6) WRONGFUL USE OF
18  RONALD M. GOULD, in his personal         )  ADMINISTRATIVE PROCEEDINGS
    capacity; JOHNNIE B. RAWLINSON,          )  (CALIFORNIA LAW);
19  in her personal capacity; AUDREY B.      )  (7) *BIVENS* CLAIM FOR DAMAGES
    COLLINS, in her personal capacity;       )  (8) RELIEF UNDER CALIFORNIA
20  IRMA E. GONZALEZ, in her personal        )  PUBLIC RECORDS ACT;
    capacity; ROGER L. HUNT, in his          )  (9) INJUNCTIVE RELIEF TO
21  personal capacity; TERRY J. HATTER       )  REMEDY FUTURE VIOLATION OF
    JR., in his personal capacity;  ROBERT   )  CONSTITUTIONAL RIGHTS.
22  H. WHALEY, in his personal capacity;     )
    THE JUDICIAL COUNCIL OF                  )
23  CALIFORNIA, an administrative            )
    agency of the State of California; and   )  JURY DEMAND
24  DOES 1-10, individuals and entities      )
    whose identities and capacities are      )
25  unknown;                                 )
                                             )
26                      Defendants.          )
                                             )
27  _____   )

28
                              -1-
                           COMPLAINT

Plaintiff Cyrus Sanai hereby alleges as follows:

## **JURISDICTION**

1.     This Court has jurisdiction pursuant to 28 USC §1331, 28 USC §1361, and 28 USC §1367.  Venue is proper in this district because the Judicial Council of the Ninth Circuit and the Judicial Council of the State of California are headquartered in this District, in the City of San Francisco, and certain of the individual Defendants have their places of work in this District, in the City of San Francisco.

## **THE PARTIES**

2.     Plaintiff, CYRUS SANAI ("Sanai"), is an attorney admitted to practice in California and various federal courts who resides in the County of Los Angeles, State of California.

3.     Defendant, ALEX KOZINSKI ("Kozinski "), is a former  Judge of the Ninth Circuit Court of Appeals until December, 2017, when he resigned while judicial misconduct charges were pending against him.  He is sued in his personal capacities for actions taken when he was ostensibly recused from any matters involving Sanai, and not for any judicial act.  Kozinski is currently a California attorney practicing before the Ninth Circuit Court of Appeals.

4.     Defendant, CATHY CATTERSON ("Catterson"), was appointed as the clerk of the Ninth Circuit Court of Appeals and Circuit Executive of the Ninth Circuit.  She was removed from her position as Circuit Executive after Kozinski ceased to be Chief Judge.  She is a resident in the Northern District.  She is sued in

her personal capacity, for actions taken under color of her position as Circuit Executive, but which were outside her duties as either Clerk or Circuit Executive.

5.     Defendant, the JUDICIAL COUNCIL OF THE NINTH CIRCUIT ("the JC") is an administrative agency of the United States that oversees the operation of federal courts within the Ninth Circuit.   Its headquarters are in San Francisco, within the Northern District.  To the extent that injunctive and declaratory relief against the JC requires an individual defendant, Defendant SIDNEY THOMAS ("Thomas"), the current Chairman of the JC, is sued in his official capacity to obtain injunctive and declaratory relief.

6.     Defendants, Thomas, M. MARGARET MCKEOWN ("McKeown"), RONALD M. GOULD ("Gould"), and JOHNNIE B. RAWLINSON ("Rawlinson") are judges of the Ninth Circuit Court of Appeals.  Defendant PROCTOR HUG, JR. is a former judge of the Ninth Circuit Court of Appeals.  They are sued in their PERSONAL CAPACITIES, in respect of actions taken as members of the JC, an administrative agency of the United States in regards to a matter that had been ordered transferred to the Judicial Council of the Third Circuit, but for which it refused to transfer.  For this and other reasons all actions for which liability is sought to be imposed hereunder was outside the jurisdiction of the JC and these defendants.  They are not sued for any actions taken as a judge or for any judicial act.

7.     Defendant, AUDREY B. COLLINS ("Collins"), is a former judge of the United States District Court for the Southern District of California, and was at the relevant time, 2009-2010, a member of defendant the JC.  She is sued in her PERSONAL CAPACITY, in respect of actions taken as member of an administrative agency of the United States in regard to a matter that had been ordered transferred to the Judicial Council of the Third Circuit, but for which it refused to transfer.  Accordingly, all actions for which liability is sought to be

imposed hereunder was outside the jurisdiction of the JC and Collins.  She is not sued for any actions taken as a district court judge or for any judicial act.

8.      IRMA E. GONZALEZ ("Gonzalez");  ROGER L. HUNT ("Hunt"), TERRY J. HATTER, JR. ("Hatter") and ROBERT H. WHALEY ("Whaley") are United States District Court judges.  Together with McKeown, Gould, Rawlinson, and Thomas they are the identified as the "Current JC Judges"  The Current JC Judges and Hug and Collins are the "2010 JC Defendants."  They are sued in their PERSONAL CAPACITIES, in respect of actions taken as members of the JC, an administrative agency of the United States, in regard to a matter that had been ordered transferred to the Judicial Council of the Third Circuit, but for which it refused to transfer.  For this and other reasons all actions for which liability is sought to be imposed hereunder was outside the jurisdiction of the JC and the 2010 JC Defendants.  They are not sued for any actions taken as a judge or for any judicial act.

9.      Defendant, MOLLY DWYER, ("the Clerk"), is sued in her official capacity as Clerk of the Ninth Circuit Court of Appeals.  The only relief requested of her is the public release of documents in her control.

10.     Defendant, the JUDICIAL COUNCIL OF CALIFORNIA, is an administrative agency of the State of California.  Its headquarters are in San Francisco, CA.  It is sued in its official capacity under the California Public Record Act.

11.     Defendants, DOES 1-10, are individuals in the state or federal judiciary and who possess documents necessary and/or useful for Sanai to employ in his defense or knowledge required to be obtained by testimony, and/or who are proxies or catspaws for Kozinski.

# INTRODUCTION

12. For more than two decades, former Chief Judge of the Ninth Circuit Kozinski sexually harassed and hazed his clerks, colleagues and third parties within his judicial chambers, the courthouses, and in public view. A significant minority of the district court judges and the federal circuit court judges in the Ninth Circuit knew this while it was ongoing, including all of the judges who served on the Ninth Circuit Judicial Council from 1998 to 2017, and all of the circuit court judges with chambers in Pasadena. *See, e.g.* J. Donohue, "I Was a Federal Judge. My Former Colleagues Must Stop Attending Federalist Society Events," *Slate.com*, November 12, 2019 ("A distinct minority of judges behaving outside the norms with the silent acquiescence of the judiciary is reminiscent of the recent judicial sexual harassment scandal. Then, as here, some judges were aware of a minority of colleagues in their midst engaged in offending conduct—yet said and did nothing. Because of their silence, sexual harassers harmed more victims, and the judiciary's reputation was stained when the scandal finally exploded.") One of Kozinski's most potent tools for sexual harassment was pornographic videos he streamed directly from pornographic websites on the Internet, and when that proved too risky, from a server he set up in his home and which he accessed with his computers in his chambers.

13. From no later than 1998 the members of the JC had become aware of Kozinski's improper use of the Internet and Kozinski's abuse of his clerks. However, rather than rein Kozinski in, at every step of the way the JC sought both the enable his access to pornography while concealing its knowledge of what Kozinski was using it for. By 2001 the issue had burst out in the open, thanks to Kozinski's shutting down a firewall blocking Internet access, and his picking a public fight with L. Ralph Mecham ("Mecham"), then the head of the Administrative Office of the United States Courts. The matter even spilled into a Congressional hearing.

14.     Kozinski won the battle over unfettered access to pornography, in that the Judicial Conference agreed to stop tracking the identity of the large video files that were downloaded over the Ninth Circuit's Internet system, but Kozinski came to understand that there was no way to conceal or block system administrators from accessing his history of the pornography sites he visited from the Ninth Circuit's internal network.   Around 2002, Kozinski set up a server at his home on which he placed his carefully curated pornography that he accessed via his computer in his chambers.  At this point, the primary purpose of accessing the porn was to haze and sexually harass his female clerks.  In 2005 Sanai discovered a different misuse by Kozinski of this server, and filed a judicial misconduct complaint against Kozinski. A year later, Judge Kozinski's predecessor as Chief Judge, Marie Schroeder, issued an order dismissing the complaint based on the fake finding of fact that Kozinski apologized for his misconduct; she also found that there was no evidence of the existence of this server or the documents on it.    Sanai eventually discovered that the reason for Schroeder's denial of its existence was, as Schroeder and the members of the JC knew, that Kozinski was using it to stream pornography into his chambers, and the JC (on which Kozinski served) intended to enable this conduct.

15.     Realizing that the JC would never take action, Sanai blew the whistle on Kozinski through the *Los Angeles Times*.  Even though a pending misconduct complaint filed by Sanai addressed the existence of the server, Kozinski filed a misconduct complaint against himself.  However, in a surprise move, Justice Roberts ordered that the complaint, and any other complaint covering the same subject matter, be transferred to the Third Circuit Judicial Council.  The JC refused to transfer the pending complaint because it stated it was unrelated, but then stayed it because it found that it was in fact related to the transferred complaint.

16.     Both Sanai and Mecham filed misconduct complaints against Kozinski for his pornographic misconduct.  The Third Circuit stated that the complaints had to be filed with the JC, and then transferred.  When the complaints were filed with

the JC, the JC violated Justice Roberts' order and refused to transfer Sanai's complaint because it found, that as to Sanai only, "exceptional circumstances did not exist", even though it covered the same subject matter as Kozinski's complaint against himself.  Sanai contacted the Supreme Court, and the Clerk stated that Justice Roberts' order transferred jurisdiction of any complaint involving Judge Kozinski's pornography to the Third Circuit Judicial Council.

17.    Because Sanai was excluded from participating in the Third Circuit proceedings, the result was a whitewash.  In particular, based on Kozinski's testimony under penalty of perjury that he had never shown the contents of his porn server to anyone else, the Third Circuit Judicial Council found "credible" that Kozinski had not shown his pornography collection to any else; in fact, the members of the JC knew this to be false, and Sanai directly alleged otherwise and could have shown how it would be proved. Kozinski's false testimony constituted criminal perjury and judicial misconduct warranting impeachment and removal. It would also constitute grounds for him to be disbarred as California attorney.

18.    With Kozinski and the JC having successfully quashed any investigation into Kozinski's accessing pornography to torment his clerks, Kozinski and the JC decided to use the full power and force of the prestige of their position to disbar Sanai. Sanai's misconduct complaints were assigned to Kozinski's best friend on the Court, and fellow pornography aficionado, Stephen Reinhardt.  Judge Reinhardt found that claims against Kozinski were fully disposed of by the Third Circuit, and that the other claims which related to Kozinski's misconduct were merits related, even though the allegations explicitly demonstrated that they were not.  Reinhardt stated that sanctions should be imposed on Sanai for filing a completely truthful and valid misconduct complaint.

19.    The 2010 JC Defendants issued a published censure of Sanai as retaliation for filing his valid misconduct complaint and instructed that it be put to the California Bar Association.

20.    Though Kozinski was not supposed to be handling this matter, he took over prosecution and gave instructions to Catterson.  When the Office of Chief Trial Counsel of the California Bar Association ("OCTC") initially refused to take any public action, Catterson began a campaign of putting personal and legal pressure on it  to file charges against Sanai.  When the OCTC requested supporting documentation, Catterson explained that none would be provided, not even the misconduct complaints Sanai filed.

21.    Catterson was informed, in writing, that without evidence or witnesses, it would be impossible to successfully prosecute Sanai.  However, when a new, politically ambitious Chief Trial Counsel, Jayne Kim, was hired, Catterson improperly convinced her to file a complaint based not only the misconduct complaint case, but other ligation in which Kozinski had been interfering with both publicly and behind the scenes.

22.    By 2014 the OCTC  had created a strategy of bringing claims that were barred by the limitation rule and the evidence-less claim of the JC to trial.  Sanai, defending himself,  obtained dismissal of all but one charge when the OCTC rested in 2015.  One charge was abated however.

23.    Two years later, Kozinski's sexual harassment misconduct was laid bare by *The Washington Post*.  Even though Kozinski's sexual misconduct was an open secret in the legal press—in part because Kozinksi sexually harassed comely female legal writers as often as his own clerks—his status as both a named and anonymous source, and gatekeeper for admission to lucrative speaking and networking opportunities, gave him protection from exposure by most legal beat reporters and legal columnists.[1]  However, the reporter for *The Washington Post* was

---

[1] Three notable exceptions in 2005 were Cynthia Cotts of Bloomberg, Terry Carter of *The ABA Journal*, and in the face of repeated roadblocks by his editor,  John Roemer of *The Daily Journal*.  None of them currently hold these jobs.  In contrast, the legal reporters and editors of *Slate, The New York Times* and *Wall Street Journal*

on the national security beat and had no relationship with Kozinski, and after interviewing persons with knowledge, including Sanai, he authored two devastating articles that forced Kozinski's resignation.

24.     But even after Kozinski resigned, he still possesses sufficient sway with his friends in the Ninth Circuit to enact retaliation.  Most notably, after Kozinski resigned, through the machination of Circuit Judges Ikuta and Reinhardt, he got his former daughter-in-law Leslie Hakala fired from her partnership position at K&L Gates in retaliation for her legal tactics in divorcing Kozinski's son, Yale Kozinski, as she sought information about Kozinski's sexual harassment history. Kozinski continues to wield power in the legal press thanks to his still vibrant relationships as an anonymous and background source for many reporters.  Though all of the Current JC Judges and 2010 JC Defendants know that Kozinski committed perjury before the Third Circuit Judicial Council, they have refused to take any action to have discipline imposed on Kozinski as an attorney.

25.     Kozinski's role as a litigator is a threat to due process.  Kozinski is impervious to any kind of restriction or restraint in the Ninth Circuit Court of Appeals or the District Courts.  He has the power to contact judges ex parte and to violate other rules and restrictions with impunity, because the JC and Court of Appeals has demonstrated it will not rein him in.  Indeed, Kozinski can prevent any kind of punishment or discipline by threatening, directly or by implication, to reveal past Ninth Circuit judicial misconduct, including, most notably, the enablement by the 2010 JC Defendants of his sexual harassment.  Kozinski's position as a lawyer who has a permanent judicial indulgence granting him impunity is a direct threat to the integrity of any legal proceedings in which he formally or informally participates.  Who is going to stop him from calling his former clerk, Circuit Judge

---

were  completely captured by Kozinski due to his acting as a source and his arrangement for speaking opportunities for reporters at high-profile legal functions.

Sandra Ikuta, about a case?  After decades of protecting Kozinski from his misconduct, will Judge Schroeder report him to the bar for secretly asking her to grant some discretionary relief for one of his clients?  The answers are "No one" and "No."  These risks are exacerbated by the fact that the Ninth Circuit, unlike every other Circuit to have considered the issue, does not recognize or enforce an obligation on judges to disclose past or existing relationships with the parties in a case, their lawyers, law firms, or witnesses who will or have provided testimony or declarations.

26.     Sanai has filed this lawsuit to obtain the following redress:

A.     Vacatur of the censure order imposed against him by the Judicial Council, and its replacement with declaratory findings of fact setting out, with specificity, Judge Kozinski's sexual misconduct; identification of the person who enabled it and their roles and responsibilities; and full disclosure of how the JC quashed objections and complaints against Kozinski and retaliated against Sanai, Mecham and others;

B.     disclosure of all documents relating to Sanai and the litigation addressed in his misconduct complaints, and Sanai in general;

C.     an award of damages in favor of Sanai as against Kozinski, Catterson and the 2010 JC Defendants who acted outside their  jurisdiction by imposing censure on Sanai, barring him from filing misconduct complaint in this matter, and seeking his disbarment while refusing to provide any evidence or testimony in support thereof;

D.     Injunctive relief permanently enjoining the JC from imposing any sanctions for filing of misconduct complaints on any person;

E.     Injunctive relief barring the Current JC Defendants and Collins from participating in any legal proceeding in which Sanai is a party, attorney or witness;

F.     A declaratory judgment that there is probable cause to find that Kozinski committed perjury and referral the Ninth Circuit and California Bar Association to impose discipline, up to and including disbarment;

G.     An injunction ordering the JC to promulgate effective rules and procedures requiring judges in the Ninth Circuit to **fully** disclose past and current relationships between the judges in which the case is proceeding and lawyers, law firms, identified witnesses, and parties in the case as and when disclosed to the judge; and

H.     Relief under the California Public Records Act and the United States and California Constitutions to obtain documents from the Judicial Council of California.

## COMMON ALLEGATIONS

**The JC and Judicial Misconduct**

27.     The JC is a federal administrative agency.  One of its responsibilities is to administrate the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§351-364 in the territory of the Ninth Circuit (the "JCDA"), under the quasi-appellate jurisdiction of the Judicial Conference of the United States.  The JCDA was created as a supplement and aid for the power to remove judges established by the Constitution in Congress.  Just as Congress' power of impeachment is outside the domain of due process, the JCDA created a system of investigation and judicial wrist-slapping that has no connection to due process.  It is fundamentally inquisitorial and does not resemble "ordinary litigation".

> First, the need for finality has less relevance to the present circumstances than it does to litigation generally. In ordinary litigation, there is not only a strong interest in reaching a correct conclusion, but also an interest in achieving finality so that the parties may obtain repose and their dispute be finally settled. The need for finality arises both from the nature of an adversary system, which requires parties to pursue their own claims as they see fit, and from

the negative consequences of allowing a dispute to continue after a decision has been rendered in an initial, full adjudication. Parties to litigation are thus generally not allowed to revive fully adjudicated claims by serially advancing new legal theories not raised in earlier proceedings but involving the same underlying transactions.

By contrast, misconduct proceedings under the Judicial Conduct and Disability Act are adversarial only to the extent that they may be initiated by complaint and usually allow interested parties some opportunity to present their respective view of the events in question. **Fundamentally, however, misconduct proceedings are inquisitorial and administrative.** Chief circuit judges need not passively await the filing of complaints and then referee a contest between a complainant and a judge, bounded by the four corners of the complaint. Instead, chief circuit judges may "identify" and review complaints themselves. See 28 U.S.C. §§ 351(a)-(b), 352(a). **In addition, a complainant who has initiated a complaint does not have the full rights accorded a party to litigation. See 28 U.S.C. § 358(b). Indeed, the Act provides no mechanism for a complainant to withdraw a complaint. Thus, the Illustrative Rules "treat [ ] the complaint proceeding, once begun, as a matter of public business rather than as the property of the complainant. The complainant is denied the unrestricted power to terminate the proceeding by withdrawing the complaint."** Commentaiy to Illustrative Rule 19. Furthermore, Illustrative Rule 10(a) allows special committees, on which chief judges sit ex officio, the right to "expand the scope of the investigation to encompass" misconduct that is "beyond the scope of the complaint."

**The inquisitorial nature of a misconduct proceeding is the direct result of the Act's adoption of a self-regulatory system in recognition of the need to maintain judicial independence, as opposed to a system in which misconduct complaints are adjudicated by an external tribunal. Under this self-regulatory regime, the responsibility of chief judges, special committees, judicial councils, and the Judicial Conference, must be to vindicate the process rather than adjudicate the rights of parties.** Moreover, there cannot be public confidence in a self-regulatory misconduct procedure that, after the discovery of new evidence or a failure to investigate properly or completely serious allegations of misconduct, allows misconduct to go unremedied in the name of preserving the "finality" of an earlier, perhaps misfired, proceeding.

*In re Manuel Real* 517 F.3d 563, 567-68 (2008 Judicial Conf. of U.S.)(bold emphasis added).

28.     Under this system, there is no separate investigation, no independent prosecution, and no impartial tribunal.   The investigation, prosecution and adjudication are all combined.  The JCDA was created to move the first line of judicial misconduct investigations and response from the House of Representatives to the judiciary itself.  However, the implementation of this legislation by most of the Circuits has evolved into a mechanism for covering up and enabling judicial misconduct.  This evolution arose in part from three features in the statute.  Section 28 U.S.C. §352(b)(1) authorizes dismissal of a complaint if it "directly related to the merits of a decision or procedural ruling."  This was  interpreted to mean that the handling of a misconduct complaint itself could never be judicial misconduct, even though the JCDA is not a court. The second feature is that Congress implemented a requirement of confidentiality (though not privilege) that means complaints and orders dismissing them are stripped of any content allowing identification of the relevant judges.  28 U.S.C. §360.  The third feature is that the Act allows dismissals for guilty judges if they apologize and promise to do better, often without public identification.  Thus in one recent case, a Kansas District Court Judge who engaged in years of sexual harassing conduct and spurned his duties to appear in court sessions was let off with a warning, instead of being referred to the House for impeachment and removal, while the specific details of his misconduct have been kept secret from the public and Congress.

29.     The federal courts have arrogated a new power.  The JCDA's statutory language does not grant the Judicial Councils any power to impose sanctions or penalties on non-judges or complainants. Indeed, the JCDA identifies the kinds of disposition and actions a Judicial Council may take, and none of them include punishing whistleblowers.  *See* 28 U.S.C. §§352, 354.   Section 358 authorizes judicial councils to adopt "rules for the conduct of proceedings" under the Act. In

1986, a special committee of the chief judges of the courts of appeals formulated Illustrative Rules Governing Complaints of Judicial Conduct and Disability for circuit councils to consider adopting, which were revised in 2000.  These rules do no provide for the imposition of sanctions or punishment on a complainant either. The Ninth Circuit's own local rules also do not provide for censure, punishment, or retaliation against a complainant.  Thus there is no legal basis of any kind to take these actions, yet the JC does so as a means of retaliation.

30.     The JC was the most zealous of all the Judicial Councils in utilizing the JCDA to enable judicial misconduct.  It limited the number of pages of misconduct complaints, then dismissed most for failure to plead specific facts.  When judicial misconduct was made public, misconduct complaints were pre-emptively filed by members of the JC and sham investigations held.  A sterling example of this involved Nevada District Court James Mahan. In 2006 the *Los Angeles Times* published an expose of the Nevada court system, which included detailed allegations that Judge Mahan repeatedly appointed George Swartz, a business partner and political supporter, to lucrative positions as a receiver.  Defendant Hatter filed a misconduct complaint against Mahan, and Mahan was cleared by the JC.  The JC resolved the complaint, in the face of detailed allegations of wrongdoing, with the following:  "Based on the investigation and report of the special committee, the Judicial Council concludes that many of the alleged personal connections were not of the nature or extent alleged.  The Judicial Council further concludes the connection that did exist did not reasonably call into question the district judge's impartiality or ability to preside over the federal cases at issue…."

31.     The policy of the JC from the 1990's onward, under the Chief Judgeships of Defendant Hug, Judge Mary Schroeder, Defendant Kozinski, and Defendant Thomas, was to utilize the JCDA system to protect Article III judges from misconduct complaints and if public questions arose, to issue orders clearing

them without conducting meaningful or good faith investigation.

32.    This practice was, however, exposed by Kozinski.  Manuel Real, a United States District Court judge who was appointed by Lyndon Johnson and only died last summer, realized during his service as Chief Judge of the Southern District of California that the JCDA system, combined with ordinary judicial immunity, insulated him from any repercussions from deciding cases according to his own private sense of right and wrong.  Real began openly flouting both the law and Ninth Circuit resolutions of litigation, and as Chief Judge began transferring cases to himself that he wanted to be involved in.  Even after Real lost the formal power to transfer cases to himself as Chief Judge, he used his power to deem cases "related" to effectuate transfer, and then decide the cases as he saw fit.

33.    At some point in the 1990's Kozinski was personally offended by Real's repeated judicial thumbing of his nose at the Court of Appeals, and he began a campaign behind the scenes to force Real's retirement or removal.

34.    Kozinski got his opportunity in *In re Canter,* 299 F.3d 1150 (9th Cir. 2002), where Real took control over the bankruptcy proceeding of a white collar felon whose probation he personally supervised to impose a permanent automatic stay on removing her from her home.

35.    A judicial misconduct complaint was filed against Real, and as usual it was dismissed by Schroeder based on "corrective action".[2]  In what can only be called a rhetorical and logical masterwork, Kozinski demolished the conclusions of his colleagues Chief Circuit Judge Schroeder, Circuit Judges Alarcon, Kleinfeld, William Fletcher and Defendant McKeown, who along with four district court judges ruled that that the complaint against Judge Real should be dismissed.  Judge Kozinski wrote the following prescient analysis:

_____

[2]  *See In Re Complaint of Judicial Misconduct (Real),* 425 F.3d 1179 (9th Cir. 2005).

Passing judgment on our colleagues is a grave responsibility entrusted to us only recently. In the late 1970s, Congress became concerned that Article III judges were, effectively, beyond discipline because the impeachment process is so cumbersome that it's seldom used. *See* 126 Cong. Rec. S28091 (daily ed. Sept. 30, 1980) (statement of Sen. DeConcini). At the same time, Congress was aware of the adverse effects on judicial independence if federal judges could be disciplined by another branch of government using means short of impeachment. *See* S.Rep. No. 96-362, at 6 (1979), *reprinted in* 1980 U.S.C.C.A.N. 4315, 4320. The compromise reached was to authorize federal judges to discipline each other. *See* 126 Cong. Rec. S28091. We are unique among American judges in that we have no public members — lawyers or lay people — on our disciplinary boards. See American Judicature Society, Appendix C: Commission Membership, at http://www.ajs.org/ethics/pdfs/Commission%20membership.pdf (revised Aug. 2003) (listing disciplinary procedures for all state judges). Rather, judicial discipline is the responsibility of the circuit judicial councils — bodies comprised entirely of Article III judges. *See* Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, Pub.L. No. 96-458, 94 Stat. 2035 (1980).

 Disciplining our colleagues is a delicate and uncomfortable task, not merely because those accused of misconduct are often men and women we know and admire. It is also uncomfortable because we tend to empathize with the accused, whose conduct might not be all that different from what we have done — or been tempted to do — in a moment of weakness or thoughtlessness. And, of course, there is the nettlesome prospect of having to confront judges we've condemned when we see them at a judicial conference, committee meeting, judicial education program or some such event.

Pleasant or not, it's a responsibility we accept when we become members of the Judicial Council, and we must discharge it fully and fairly, without favor or rancor. If we don't live up to this responsibility, we may find that Congress — which does keep an eye on these matters, *see, e.g.,* Operations of Fed. Judicial Misconduct Statutes: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Prop. of the House Comm. on the Judiciary, 107th Cong. (2001); Report of the Nat'l Comm'n on Judicial Discipline and Removal (1993) — will have given the job to somebody else, materially weakening the independence of the federal judiciary.

*In re Complaint of Judicial Misconduct (Real),* 425 F.3d 1179, 1183  (9th Cir. 2005)(Kozinski, C.J., dissenting).

36.     By writing a brutally incisive dissent to the efforts of Judge Schroeder and eight other members of the JC to "see no evil" in regards to Judge Real, Kozinski broke the code of silence that ensured that judicial misconduct and corruption went unpunished in the Ninth Circuit.  Judge Kozinski's dissent forced Schroeder to reopen the investigation, and Judge Real was found guilty.  He took the matter to the Judicial Conference.  To address Judge Real's misconduct, the Judicial Conference crafted a new rule that persistent rejection of judicial precedent was misconduct, but then found that Judge Real was not YET guilty of that.  *See In re Manuel Real,* 517 F.3d 563, 567-68 (2008 Judicial Conf. of U.S.)

37.     The investigation of Judge Real was the sole exception to the JC's policy of using the judicial misconduct mechanism to enable and facilitate judicial misconduct, rather than quash it—and it only acted because Kozinski forced it to do so.

**Alex Kozinski and Pornography in Court**

38.     The Ninth Circuit was aware no later than 1998 that it had a significant and ever growing problem involving employees of the federal judiciary using government-owned computers to download pornography. The heaviest user of pornography for browsing purposes was Kozinski.  Kozinski utilized pornography for three purposes.  First, his sexual titillation.  Second, he enjoyed using it as a tool to harass women.  Third it was a way of testing women's limits to his sexual approaches.  When Mecham and the former Ninth Circuit  executive Greg Walters proposed firewalls and tracking and blocking software, Kozinski  opposed it.  The Judicial Conference took responsibility for this program and implemented a monitoring system that showed significant and increasing downloading of music and

video files, some of which the late Judge Edwin Nelson believed included child pornography.  The system also identified to system administrators the streaming or downloading of large files.  Judge Kozinski's computers in his chambers were identified as downloading or viewing pornography.

39.     In 2001, the monitoring system and firewall was disabled unilaterally in San Francisco.  Who did this is a matter of dispute.  Mecham publicly accused Judge Kozinski of taking this action personally and suggests that this constituted criminal activity.  The late Judge Nelson ascribed it to the Ninth Circuit's executive committee acting unilaterally.  Defendant Thomas claimed that the entire JC unanimously approved the action.  Whatever the case,  Kozinski was the moving force behind this action, and his motivation was to continue to obtain access to pornography in his chambers.  It is undisputed that the 11th Circuit and 10th Circuit, which shared the firewall, had no idea this was being done; more important, if the motivation of the action was to allow de facto unfettered access to pornography by crippling the monitoring system, then the action was wrongful no matter how many judges approved it.

40.     This action triggered infighting that gained the attention of Congress and a Congressional hearing.  Kozinski was losing the war, and directly attacked Mecham in print in the Wall Street Journal.  *See* A. Kozinski, Privacy on Trial, *Wall Street Journal,* September 21, 2001.  In that article, Judge Kozinski represented to the world the following:

> The policy Judge Nelson  seeks to defend as benign and innocuous would radically transform how the federal courts operate. At the heart of the policy is a warning–very much like that given to federal prisoners–that every employee must surrender privacy as a condition of using common office equipment. Like prisoners, judicial employees must acknowledge that, by using this equipment, their "consent to monitoring and recording is implied with or without cause." Judicial opinions, memoranda to colleagues, phone calls to your proctologist, faxes to your bank, e-mails to your law clerks,

prescriptions you fill online–you must agree that bureaucrats are entitled to monitor and record them all.

This is not how the federal judiciary conducts its business. For us, confidentiality is inviolable.  No one else–not even a higher court–has access to internal case communications, drafts or  votes. Like most judges, I had assumed that keeping case deliberations confidential was a bedrock principle of our judicial system. But under the proposed policy, every federal judge will have to agree that court communications can be monitored and recorded, if some court administrator thinks he has a good enough reason for doing so.

Another one of our bedrock principles has been trust in our employees. I take pride in saying that we have the finest work force of any organization in the country; our employees show  loyalty and dedication seldom seen in private enterprise, much less in a government agency. It is with their help–and only because of their help–that we are able to keep abreast of crushing  caseloads that at times threaten to overwhelm us. But loyalty and dedication wilt in the face of  mistrust. The proposed policy tells our 30,000 dedicated employees that we trust them so little that we must monitor all their communications just to make sure they are not wasting their work day cruising the Internet.

How did we get to the point of even considering such a draconian policy? Is there evidence that judicial employees massively abuse Internet access? Judge Nelson's memo suggests there is, but if you read the fine print you will see that this is not the case.

Even accepting the dubious worst-case statistics, only about 3% to 7% of Internet traffic is  non-work related.

41.     Kozinski's published statements were misleading, and the members of the JC in 2001 knew it.  The Judicial Conference only identified and surveilled large files, which were almost entirely video files.  The problem that the Ninth Circuit was facing was not pornography viewed by employees on their own, it was Kozinski's own bizarre sexual fetishes.  However, none of the members of the JC at the time stepped forward to correct Judge Kozinski's false statements.

42.     The members of the JC who were appellate judges from 1998 onwards were also aware that Kozinski was accessing the pornography as part of his hazing

and sexual harassment of clerks.  Some of the judges were forwarded the material by Kozinski, but most heard of it second hand, through their clerks, who either witnessed it directly or heard gossip from other clerks.  In particular, Defendant Thomas heard regular comments on this topic from staff.

43.    Kozinski succeeded in keeping open access to pornography, and the Judicial Conference agreed to stop its review of large video files he downloaded or streamed.  However, as part of this settlement of the dispute, Kozinski was informed that there was no way to stop internal tracking of his access to pornography **websites**, even if the files themselves were not identified.  Kozinski was in particular worried that Greg Walters, the Circuit Executive who had been following the instructions of Mecham and the Administrative Office of the Courts, would formally blow the whistle on both his consumption of pornography and mistreatment of court personnel.

44.    From at least 1998, the JC was aware, from information provided by monitoring, that Kozinski was the heaviest user of pornography based on identification of "high-volume files", e.g. porn videos, downloaded by Kozinski.  In addition, his close friends on the bench, in particular Judges Reinhardt and Ikuta, were aware of it and had watched it with him.  Virtually all of Judge Kozinski's clerks had been made to watch  pornography, and Kozinski had invited, or in some cases, as a "joke", compelled, other clerks from other chambers in Pasadena to watch pornography.  All of the Circuit Judges who had chambers in Pasadena were aware from being informed by their clerks of Judge Kozinski's behavior in this regard by 2007.  In addition, beginning in that time period, professors at elite law schools began receiving feedback from clerks and externs about Kozinski's predilections.

45.    After 2001, Judge Kozinski, realizing that his access to pornography websites would be tracked by system administrators, decided on a new mechanism

for viewing and distributing pornography.  He set up a home server and placed his favorite, curated pornography and other materials on it, along with his public writings and other material he wanted to distribute outside the Court email system. This server, set up around 2002, made it impossible for the Court's internet service monitoring system to determine what it was that Kozinski was accessing, since all that would be reported would be accesses to Kozinski's website and server, and the Administrative Office of the Courts was barred from looking at the contents of the videos streamed or downloaded by Kozinski.

46.     In 2005 Sanai submitted an opinion piece to *The Recorder* of San Francisco concerning the ongoing controversy over citation of unpublished opinions.[3]  He addressed a matter of great public interest that was about to be decided by the Judicial Conference, then-proposed (and now adopted) Federal Rule of Appellate Procedure 32.1.  Kozinski's testimony to Congress on this subject was cited by Sanai as representing the view of those opposing citation of unpublished opinions, and Howard Bashman's commentary was quoted as representative of the side favoring citation. Sanai also urged the Court to grant more rehearings en banc to settle perceived or actual conflicts in Ninth Circuit authority, starting with the conflicts surrounding the Court's *Rooker-Feldman* precedent.

47.     It was while researching Kozinski's views on the subject of citation of unpublished appellate dispositions that Sanai first came across alex.kozinski.com, specifically the directory alex.kozinski.com/articles/.  There were numerous links discoverable by Google to articles in this directory, some of which had clearly been supplied by Judge Kozinski himself.

48.     Four days after Sanai's article was published, the Judicial Conference decided the issue in favor of permitting citations.  Judge Kozinski was quoted

---

[3]  C. Sanai, *Taking the Kozinski Challenge,* The Recorder*, September 16, 2005

condemning this move by the Judicial Conference, and expressing his hope that the Supreme Court would reject it.[4]

49.    Two days later, Judge Kozinski published his response to Sanai's article in *The Recorder*.[5] Judge Kozinski laid out a response to the arguments in the pending petition and a novel analysis of the Ninth Circuit's past precedent concerning the *Rooker-Feldman* doctrine.

50.    Kozinski's article did not address the primary subject of Sanai's article, which is the citation policy of the Ninth Circuit.  It ignored Sanai's discussion of the debate between the majority and dissent over what constitutes binding precedent in the Ninth Circuit.[6]  Kozinski focused the first part of his article solely on trying to rebut Sanai's contentions that there is a severe conflict in the Ninth Circuit's authority concerning the *Rooker-Feldman* doctrine, a fact so obvious that District Court judges have commented on it.[7]  He began the second part of his article as follows:

_____

[4] Tony Mauro, *Cites to Unpublished Opinions Ok'd,* Legal Times, September 21, 2005

[5] Alex Kozinski, *Kozinski Strikes Back,* The Recorder, September 23, 2005.

[6] *See Barapind v. Enomoto,* 400 F.3d 740, 751 fn. 8 (9th Cir. 2005)(en banc).

[7]  The specific legal issue that was addressed in *Taking the Kozinski Challenge* was whether the Ninth Circuit was following its own precedent that the *Rooker-Feldman* doctrine does not apply to non-final interlocutory orders challenged while the case was in litigation in state court.  Sanai stated that the Court was not following its own precedent; Kozinski contended that Sanai was not telling the truth.  Kozinski's contentions were completely dishonest, as discussed in a subsequent order by a Ninth Circuit District Court Judge:

> With respect to the Injunctive Orders, they appear to be non-final, interlocutory orders. In 2001, the Ninth Circuit held that *Rooker-Feldman* applies to interlocutory orders. *See Doe & Assocs. Law Offices v. Napolitano,* 252 F.3d 1026, 1030 (9th Cir. 2001) (approving of *Richardson v. D.C. Ct. of App.,* 83 F.3d 1513, 1515 (D.C. Cir.

1
2
3
4
5
6
7
8

Despite his colorful language, Mr. Sanai's article raises no legitimate question about whether the Ninth Circuit has been derelict in following circuit or Supreme Court precedent. But the article does raise serious issues of a different sort. Mr. Sanai's article urges us to "grant en banc rehearing of the next decision, published or unpublished, which asks the court to resolve the split among *H.C., Napolitano* and *Mothershed.*" A petition for en banc rehearing raising this very issue crossed my desk just as Mr. Sanai's article appeared in print. The name of the case? *Sanai v. Sanai.* A mere coincidence of names? Not hardly. The petition, signed by Mr. Sanai, cites the same cases and makes the same arguments as his article — including the reference to "Catch-22."

9

*Kozinski Strikes Back, supra.*

10

51.   Judge Kozinski placed case-related documents on his personal website,

11

www.alex.kozinski.com, and had the web version of his article link to the .pdf file

12

of the selection of these documents on his website.  Subsequently, Judge Kozinski's

13

wife revealed that Judge Kozinski's actions was motivated not just by the litigation

14

15
16
17
18
19
20
21
22
23
24
25
26

1996)). In 2005, relying on *Exxon Mobil Corp. v. Saudi Basic Indust. Corp.,* 544 U.S. 280 (2005), the Ninth Circuit stated that *Rooker-Feldman* only applies after state court proceedings have ended, i.e. "when the state courts finally resolve the issue that the federal court plaintiff seeks to relitigate in a federal forum. . . ." *Mothershed,* 410 F.3d at 607 n.3 (amended opinion). After 2005, however, the Ninth Circuit in several unpublished cases cited *Doe & Assocs.* for the proposition that *Rooker-Feldman* applied to interlocutory orders. *See, e.g., Hanson v. Firmat,* 272 Fed. Appx. 571, 572 (9th Cir. 2008); *Melek v. Kayashima,* 262 Fed. Appx. 784, 785 (9th Cir. 2007); *Bugoni v. Thomas,* 259 Fed. Appx. 11, 11-12 (9th Cir. 2007); *see also Ismail v. County of Orange,* 2012 U.S. Dist. LEXIS 65793, *25-*26 (C.D. Cal. Mar. 21, 2012); *cf. Marciano*, 431 Fed. Appx. at 613 (discussing only *Mothershed*).
　　　The Court is not convinced that the parties have adequately addressed *Rooker-Feldman*. The parties have not discussed or even cited *Mothershed* or *Doe & Assocs*.

27

*CMLS Management, Inc. v. Fresno County Superior Court,* No. 11-cv-1756-A WI-SKO, 2012 WL 2931407 (E.D. Cal. July 18, 2012) at *10.

28

Kozinski addressed in the article, but also by Sanai accomplishing the exceptionally rare removal for misconduct of a well-connected Los Angeles County Superior Court Judge (and Kozinski friend), Elizabeth Grimes, from a completely separate case, *Sanai v. Saltz*.[8]

52.     Sanai filed a judicial misconduct complaint against Judge Kozinski in October of 2005.  The order concerning the complaint was issued on December 19, 2006, more than 14 months later.[9]  It terminated the complaint on the grounds (a) that corrective action had been taken as to Judge Kozinski's publication in the *Recorder,* and (b) there was no evidence of any website controlled by Judge Kozinski which held such materials.

53.     A key fact in the complaint was that Judge Kozinski had scanned in documents from the record of a case not before his Court, and linked the documents to the on-line versions of his article at the website "law.com".  Various .pdf scans were placed on alex.kozinski.com.[10]

54.     The *Recorder* and law.com site made its web-based articles available for a period of one year, then erases them.  Accordingly, the Kozinski article and the link to the .pdf files he had published are no longer accessible on the site.

---

[8] *See* Letter from Judge Kozinski's wife, Marci Tiffany, patterico.com/2008/06/16/alex-kozinskis-wife-speaks-out.
[9] *In Re Complaint of Judicial Misconduct (Kozinski),* No. 05-89098 (2006)
[10] Though the evidence of Judge Kozinski's publication of case-related materials is no longer on the law.com site, it was available on the well-known blog *How Appealing,* which is financed by the law.com site but run separately by Howard Bashman. Amazingly enough, after almost twenty years, the online version of the article captured by Mr. Bashman is still found at http://pda-appellateblog.blogspot.com/2005_09_01_pda-appellateblog_archive.html. The on-line version of the article has a link, "read the pdf". This link points to the link /alex.kozinski.com/judge.thibodeau.pdf. The site alex.kozinski.com itself has been rendered inaccessible; the "How Appealing" link is a proxy server snapshot that is holding an image of the original link.

55.     Judge Schroeder wrote that her limited inquiry "found no posting of complainant's case-related information on any website maintained by the judge", a finding she could only have made without fear of immediate contradiction after the article was erased on the law.com site.  She was not aware, however, that Bashman would continue the host a copy of the on-line version, including its link to Judge Kozinski's website, to this day.  *See* footnote 9, *supra*.

56.     Schroeder's delay of more than one year caused the loss of the evidence about contents of the .pdf that Kozinski put on the internet, but not the link itself, thanks to Mr. Bashman.  As the chief circuit judge at the time, Judge Schroeder was charged under the Judicial Discipline Rules then in effect with evaluating a complaint and dismissing it or finding it is moot and concluding the proceeding pursuant to Section 352(b) of Title 28, or appointing a special committee to investigate the charges pursuant to Section 353 thereof.  In particular Section 352(a) of Title 28 of the JCDA states that the "chief shall expeditiously review any complaint…." This standard has been determined to mean 60 days from filing.

57.     Schroeder made the explicit factual finding of "no posting of complainant's case-related information on any website maintained by the judge." This finding of fact is contrary to the truth.  The online version of Judge Kozinski's article on the Recorder's website, "law.com" included a link to the site alex.kozinski.com   The link was active when Sanai filed the complaint, and at least a month thereafter.  Schroeder's delay resulted in the elimination of that article from the law.com site proper, but not from the related but separately-managed "How Appealing" site.

58.     Schroeder and the appellate members of the JC at the time were aware that Kozinski had shifted his pornography viewing to his server, and was using this pornography for his continued hazing  and sexual harassment of his clerks.  Judge Schroeder took these actions to give Kozinski time to take his website off-line and

scrub the contents.  Schroeder was aware from her communications with Kozinski about Sanai's complaint that Kozinski needed time for most of the evidence to disappear, which she willingly gave him.

59.     Sanai filed a petition to review Judge Schroeder's order, which was denied by the JC with its form order.   Sometime in 2007, Judge Kozinski concluded that it was safe to reactivate the alex.kozinski.com website, which he needed in order to resume watching pornography in his chambers and to force his clerks to watch it.  He therefore brought the site back on-line and began distributing links to the portion of the site which includes his articles, including a .pdf scan of the paper version of the "Kozinski Strikes Back" article. (The paper version differs from the on-line version in one important respect—the online version included a hyperlink to case materials posted by Judge Kozinski on alex.kozinski.com/judgethibodeau, which materials have either been moved or removed, while the paper version obviously had no such link).

60.     Sanai  filed a second judicial misconduct complaint in November of 2007 regarding Judge Kozinski's redistribution of "Kozinski Strikes Back".  Judge Kozinski, now Chief Judge, assigned the matter to Judge Schroeder, who, true to form, sat on it.  Kozinski also fired Greg Walters and appointed Catterson, a Kozinski acolyte, as Circuit Executive in retaliation for Walters' efforts to halt pornography in the Ninth Circuit and to ensure that there was no administrator independent of Kozinski who would act to stop his sexual harassment of clerks and other persons.

61.     The more Sanai thought about the treatment of Kozinski's alex.kozinski.com site, the more puzzled he became.  Why did Judge Schroeder pretend the site did not exist?  Why did Kozinski take the site down, then put it back up?   On the night before Christmas Eve, after putting his children to sleep with tales of the excitement of the next day, Sanai decided to find out what Kozinski

1   might be distributing via alex.kozinski.com website, so he entered

2   "alex.kozinski.com" into the Google search engine.

3       62.    Sanai found the reason Judge Kozinski and the JC refused to

4   acknowledge the existence of the alex.kozinski.com site: reams of pornography that

5   Kozinski was distributing.   Sanai passed the information to John Roemer of *The*

6   *Daily Journal.*  His editors killed the story, but Terry Carter of *The ABA Journal*

7   began working on it.  At this time, Kozinski had muscled his way into presiding

8   over the trial of Ira Isaacs, a distributor of the "Two Girls One Cup" scatological

9   video.  Around mid-October 2007, video-sharing sites including YouTube were

10  flooded with videos of the reactions of first-time viewers of the video. *See, e.g.,*

11  Agger, Michael (January 31, 2008). "2 Girls 1 Cup 0 Shame". *Slate.com.*  Kozinski

12  obtained great pleasure from harassing his own clerks by forcing them to watch

13  pornography, so to him, "Two Girls One Cup" was the "Citizen Kane" of the

14  Internet.    Kozinski knew that if he presided over the Ira Isaacs trial, he would have

15  an excuse to force his own clerks to watch "Two Girls One Cup" with the pretext of

16  asking them whether they found it obscene.  When Sanai read the article about

17  Judge Kozinski presiding over the trial, he tipped of the *Los Angeles Times.  Los*

18  *Angeles Times* reporter Scott Glover independently accessed the site and apparently

19  found files and documents that had been placed in the directory after Sanai  had

20  done his downloading and thus saw documents that Sanai never saw.  Kozinski

21  recused himself from the Ira Isaacs trial.

22      63.    When the *Los Angeles Times* broke the story, Kozinski filed a

23  misconduct complaint against himself.  Justice Roberts issues an order transferring

24  that complaint, and any future complaints related to the same events, to the Third

25  Circuit.

26      64.    Sanai  filed a third complaint with the Ninth Circuit, but because Sanai

27  had alleged additional facts pointing out what Judge Kozinski did with the

28

pornography—distributing it across the internet—the JC violated Justice Roberts' order and stayed his complaints by order signed, *inter alia,* by defendants Thomas, McKeown, Gonzalez, and Hatter.

65.     As the world now knows, the investigation of Kozinski by the Third Circuit was a complete whitewash, as the only witness interviewed or called was Kozinski.  Kozinski testified that he never showed anyone the pornography on his server, which was, on its face preposterous—why put it on a server connected to the Internet with Apache Internet server software installed and operative if not to be accessed by the Internet? Even while Kozinski was (theoretically) under investigation he was using his website to distribute pornography in his chambers, terrorizing his clerk Heidi Bond.  *See* http://www.courtneymilan.com/metoo/kozinski.html.  Though Kozinski's behavior was an open secret, the only witness called by the Third Circuit was Kozinski himself.  Sanai's submission to the investigative committee of the Third Circuit explaining how to find the access Kozinski made via his chambers computers was ignored, and the committee never spoke to Sanai.

66.     But once Kozinski had been "cleared" the JC began its campaign of retaliation.  First it assigned investigation of Sanai's complaint to Kozinski's best friend on the Court, Stephen Reinhardt.  It then censured Sanai and, through Catterson, began a campaign of written and verbal pressure to disbar Sanai.

67.     The 2010 JC Defendants issued a published censure of Sanai as retaliation for filing his valid misconduct complaint and instructed that it be put to the California Bar Association (the "Censure Order").  The JC lacked jurisdiction to issue the Censure Order on two grounds.  First, the misconduct complaints had been required by order of Justice Roberts to be transferred to the Third Circuit Judicial Council.   Second, Congress never granted any Judicial Council or the Judicial Conference the power to censure or sanction anyone; indeed, had it done so, the

JCDA would be unconstitutional, as it does not afford complainants minimum due process rights to prove the validity of their complaints.

68.     Though Kozinski was not supposed to be handling this matter, he took over prosecution and gave instructions to Catterson.  When the OCTC initially refused to take any public action, Catterson began a campaign of putting personal and legal pressure on the OCTC to file charges against Sanai.  When the then-Chief Trial Counsel of the OCTC wrote back asking for supporting documentation, Catterson explained that none would be provided, not even the misconduct complaints Sanai filed.

69.     Catterson was informed, in writing, that without evidence or witnesses, it would be impossible to successfully prosecute Sanai.  However, when a new, politically ambitious Chief Trial Counsel, Jayne Kim, was hired, Catterson convinced her not to hold any independent investigation, as this would have required issuing a subpoena to the JC, reviewing the documents, and discovering that the characterization of the contents of Sanai's complaints in the Censure Order was false.  Because both Catterson and the OCTC knew a charge based solely on the Censure Order would fail, Catterson, on behalf of Kozinski and the 2010 JC Defendants, assembled other meritless charges that had been previously asserted against Sanai years ago and dismissed, relating to  ligation in which Kozinski had been interfering in  both publicly and behind the scenes.

70.     By 2014 the OCTC finalized a strategy of bringing claims that were barred by the limitation rule and the evidence-less claim of the JC to trial. Defending himself, Sanai obtained dismissal of all but one charge.  The State Bar Court judge wrote about the charge relating to the reporting of judicial misconduct that:

> In this count the State Bar alleges that between October 2008 and September 2010, Respondent "filed and maintained formal judicial complaints with the Ninth Circuit Judicial

Council against approximately 19 federal judges, when such complaint were frivolous and made for improper reasons . . . . " It alleges that the filing of these complaints constituted acts of moral turpitude.

In his motion, Respondent argues that the evidence received by this court is insufficient to establish clear and convincing evidence to support this count.

The State Bar did not put in evidence the complaints actually filed by Respondent against the federal judges. **In response to this court's inquiry, it was informed by the State Bar that it was unable to do so due to the Ninth Circuit's refusal to provide those complaints to the State Bar.** Being unable even to read the complaints filed by Respondent, this court cannot conclude that any of those complaints were filed frivolously or constituted an act of moral turpitude. **To the extent that this court is aware of the content of one of those complaints, the record shows that it was apparently justified and resulted in a formal apology by the judge and a self-administered recusal by him from the pending matter involving Respondent.**

71.     In a subsequent order dismissing more charges, the State Bar Court judge wrote as follows:

In 2010, a complaint was made to the State Bar by the Judicial Council of the Ninth Circuit regarding Respondent's purportedly frivolous complaints to it about a number of federal judges. This complaint by the Judicial Council of the Ninth Circuit subsequently formed the basis for Count 6 of the pending NDC. When the complaint was received, the State Bar opened case No. 10-0-09221 (the '10 case) and contacted Respondent about the matter. **Then, after learning that the Judicial Council of the Ninth Circuit would not release to the State Bar the actual complaints filed by Respondent against the federal judges, the State Bar decided to issue a warning letter to Respondent in November 2011, and closed the case.[7] (Ex. 1040.) That decision was explained, both orally and in writing, by the State Bar to Cathy Catterson, a representative of the Judicial Council of the Ninth Circuit, on November 8, 2011. (Ex. 1041). Thereafter, she**

-30-

**complained of the State Bar's decision in a letter, dated January 19, 2012, directed to the then Acting Chief Trial Counsel of the State Bar.**

[7] The State Bar had previously notified the Judicial Council of the Ninth Circuit in May 2011 that it would be difficult to pursue any complaint that Respondent's complaints against various federal appellate justices were frivolous without having access to the actual underlying complaints. As stated by the State Bar at that time: "As you may be aware, to prevail in State Bar disciplinary proceedings, our office must prove by clear and convincing evidence that an attorney committed willful misconduct. Although the Judicial Council's order of September 30 2010, will certainly be a useful piece of evidence to establish that Mr. Sanai engaged in misconduct by filing frivolous misconduct complaints, it would be insufficient standing alone to prove by clear and convincing evidence that Mr. Sanai engaged in misconduct warranting discipline, especially since the order does not include any specific findings of fact but rather includes only the conclusion that Mr. Sanai abused the misconduct complaint procedure." (Ex. 1039, p. 2.)

[8] Given the State Bar's inability to provide this court with a copy of the actual complaints filed by Respondent against the federal judges, this court – as accurately predicted by the State Bar in May 2011 – eventually dismissed that count at trial due to the State Bar's failure to provide clear and convincing evidence that those complaints were frivolous. The evidence was not sufficient even to enable this court to identify all of the judges against whom complaints had been filed.

72.    Defending against the last pending charge requires Sanai to issue or enforce subpoenas to Kozinski, Catterson, Dwyer (as Clerk) and the JC. One of Sanai's defense theories focuses on the documented link between Kozinski's retaliatory conduct and *Sanai v. Saltz*, which was first publicly revealed in a post by Kozinski's then-wife, Marcie Tiffany.   Another rests on the prosecutorial misconduct of bringing the charge urged by the JC when the OCTC predicted it would fail without evidence from the JC, and refusing to conduct an independent investigation.  The trial is set to resume in February

of 2020.  In September of 2019, OCTC  stipulated in on the record that the charges that were dismissed will not be subject of an appeal.  Accordingly, the dismissals of all but one of the charges are final.

73.     The meritoriousness of Sanai's misconduct complaints was confirmed a decade after Sanai discovered Kozinski's pornography when a *Washington Post* national security reporter, having heard rumors about Kozinski, contacted Sanai and others and published a blockbuster pair of articles showing that Kozinski had been openly sexually harassing his clerks and third parties for years, with this pornography-laded server exposed by Sanai 13 years previously a major tool.  This exposure had many consequences.

74.     Facing a misconduct complaint that was transferred to the Second Circuit, Judge Kozinski resigned in disgrace, and started practice law before the Ninth Circuit Court of Appeal, appearing for the first time last week.  His appearance was met with anger and consternation in the legal community.

75.     Judge Kozinski's former clerk and daughter in law, Leslie Hakala, was the subject of direct retaliation by Kozinski after he resigned through Circuit Judges Reinhardt and Ikuta.  Ms. Hakala was married to Judge Kozinski's eldest son Yale, and she was a long-time employee of the SEC in Los Angeles.  Approximately four years ago she obtained a coveted partnership at K&L Gates; approximately three years ago her marriage fell apart, and she filed for divorce from Yale Kozinski.  The divorce was extremely bitter, as Ms. Hakala was the breadwinner.  When *The Washington Post* articles came out in December of 2017, her counsel sought to subpoena Judge Kozinski to obtain information about his treatment of Ms. Hakala in the context of the legal battles.  The younger Kozinski then acceded to Ms.

Hakala's demands and the divorce was settled.  After Hakala played the #metoo card and the divorce was finalized, several judges with personal relationship with attorneys at K&L Gates, including Judge Kozinski's close friend, the late Stephen Reinhardt, and Kozinski's former clerk, Circuit Judge Sandra Ikuta, independently communicated, directly and/or indirectly, to K&L Gates partners that Ms. Hakala's continued presence at the firm would injure its representation of its clients in federal court.  Ms. Hakala was then fired.

76.     In December of 2017 Sanai filed a motion with the JC to vacate the Censure Order based on the revelations regarding Kozinski and rejection of its complaint by the California Bar.  The motion has never been addressed, and is technically still pending.

## **FIRST COUNT**

## **INJUNCTIVE RELIEF FOR VIOLATION OF CONSTITUTIONAL RIGHTS**

(By Sanai as Against the JC, Dwyer, Kozinski, Catterson and the 2010 JC Defendants)

77.     Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

78.     The imposition of the Censure Order; the refusal to provide any relevant documents to Sanai after a subpoena was issued; and the prosecution of a bar complaint while withholding evidence violated Sanai's right to due process under the law.

79.     The Censure Order was unconstitutional, because the JCDA  does not give the JC jurisdiction to issue such orders, and the JCDA does not give complainants due process rights to prove their complaints or even an independent, impartial tribunal with notice of evidence used against a complainant.  Indeed, after filing a complaint, the evidence uncovered by any investigation is kept secret.  Now

that the disposition of Sanai's complaint was proven to be erroneous—as Sanai's accusations of intentional distribution of pornography by Kozinski have been shown to be true—Sanai still has no right to have the Censure Order vacated under the JC's own practices and procedures.

80.     The JC and Catterson's filing of a state bar complaint while withholding evidence and refusing to testify was a violation of Sanai's right to a fair trial in State Bar Court.  Though the State Bar Court dismissed all but one of the charges, Sanai is entitled, as a matter of due process, to disclosure of all documents which refer, relate or pertain to his misconduct complaint, the litigation referenced therein, and all records of efforts by the 2010 JC Defendants, Catterson, and Kozinski to disbar Sanai or otherwise retaliate against him.  These documents are necessary for Sanai to mount his defense that the last charge made by the OCTC should be dismissed due to prosecutorial misconduct and because it arose from illegal judicial retaliation, and to ensure that the State Bar proceedings can serve, at least in part, as a name-clearing hearing. The refusal of Catterson and the JC to provide this information was a violation of due process, and indeed obstruction of justice.

81.     Sanai was professionally injured by the Censure Order and suffered humiliation, anger and outrage over the unjust imposition of censure and the false characterization of his misconduct complaint.  Sanai has lost income from clients discouraged from hiring him as an attorney based on the false statements about his conduct made by the 2010 JC Defendants.  Sanai also has a constitutionally-protected interest in his professional reputation that he may seek to redeem by a name-clearing hearing, both in State Bar Court and in via this proceeding.

82.     Now that it has been proven to be incorrectly issued, and Sanai prevailed in the bar proceedings on the complaint filed by Catterson on behalf of the 2010 JC Defendants, he is entitled to injunctive relief to restore his reputation by a name clearing hearing in this Court and to defend against the last charge in his bar

proceedings.  First, after a full evidentiary hearing or trial, a mandatory injunction should be entered requiring the JC to vacate the Censure Order and in its place publish the declaratory judgment requested in the Third Count of this Complaint. All Defendants should also be ordered to hand over all documents (including emails and telephonic messages) that:

A.    Refer, relate or pertain to Sanai;

B.    Refer or relate to any litigation referenced in his misconduct complaints filed with JC;

C.    Refer relate or pertain to the interactions between Catterson and OCTC and Catterson and Kozinski;

D.    Refer, relate or pertain to Kozinski's battle over the firewall;

E.    Refer, relate or pertain to Kozinski's treatment of his clerks.

83.    The public interest is strongly in favor of granting relief.  Victims of Kozinski, academics, and senators all expressed disappointment and anger that the full story of Kozinski's decades of misconduct would not be exposed and that, after committing serious misconduct, he freely practices before the Ninth Circuit Court of Appeals.  While the judicial misconduct process will never expose the true facts regarding Kozinski, the JC, by imposing the Censure Order, has given Sanai standing to reveal by adversarial litigation what the JC sought to conceal.   For this reason, should the JC initiate a misconduct proceeding to investigate any of the allegations herein, this Court must enjoin such proceedings until after completion of this lawsuit.  Such an injunction is necessary to prevent the judicial misconduct process from being once again used to falsely vindicate the 2010 JC Defendants and other enablers of Kozinski.

84.    Because the 2010 JC Defendants acted with malicious intent to injure Sanai in order to protect Kozinski from exposure of how he used pornography to sexually harass his clerks, there is an unconstitutional risk of lack of impartiality if any of the Current JC Judges or Collins is assigned to a case in which Sanai is

counsel or a party.  The Court should impose an injunction barring the Current JC Judges and Collins from participating as a judge or justice in any way in a matter involving Sanai, as party or attorney.  It is a certainty that Judge Kozinski will use every resource at his command to fight this lawsuit and retaliate against Sanai. Kozinski's modus operandi for retaliation in the past has been through proxies, who included the late Stephen Reinhardt (against both Sanai and Hakala) and Catterson. Kozinski must be enjoined from doing so, and be forced to reveal his machinations.

85.    The Court should also impose an injunction barring the JC from imposing any kind of sanction or penalty on any judicial misconduct complainant as such sanctions are not authorized under the JCDA or any rules. The JC should also be ordered to promulgate effective rules and procedures requiring judges in the Ninth Circuit to fully disclose past and current relationships between the judges in which the case is proceeding and lawyers, law firms, identified witnesses, and parties in the case as and when disclosed to the judge.

## SECOND COUNT

### MANDAMUS

(By Sanai as Against the JC)

86.    Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

87.    The imposition of the Censure Order and the prosecution of the State Bar complaint was outside the jurisdiction of the JC, in bad faith and irrational.

88.    A district court may issue an order compelling a governmental agency to perform a non-discretionary act, or vacate or correct actions outside of its jurisdiction, by way of mandamus.  28 U.S.C. §1361.  A district court also has authority to confine another agency to its proper jurisdiction by way of mandamus under the All Writs Act.

89.     It is clear that the JC lacks jurisdiction to impose any kind of sanction on complainants.  This is because, in addition to the plain language of the JCDA, the JCDA does not give complainants due process rights to prove their complaints or even an independent, impartial tribunal.  Indeed, after filing a complaint, the evidence uncovered by any investigation is kept secret.  Now that the disposition of Sanai's complaint was proven to be erroneous—as Sanai's accusations of distribution of pornography by Kozinski within the Court have been shown to be true—Sanai the Censure Order should be vacated on the merits and because it is void.

90.     The JC and Catterson's filing of a bar complaint while withholding evidence and refusing to testify was a violation of Sanai's right to a fair trial in State Bar Court and outside the jurisdiction of the JC.

91.     Sanai was professionally injured by the Censure Order.  Now that it has been proven to be incorrectly issued, and Sanai prevailed in the bar proceedings on the complaint filed by Catterson, he is entitled to a judgment of mandamus vacating the Censure Order, and prohibiting the JC from imposing sanctions on any complainants of any kind.  Sanai exhausted his administrative remedies by filing a motion to vacate the Censure Order in December of 2017, which the JC refused to act upon.

## THIRD COUNT

## DECLARATORY JUDGMENT

### (By Sanai as Against the JC and Kozinski)

92.     Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

93.     Sanai accused Kozinski of distributing pornography for improper purposes via his server, and various other federal judges of aiding and abetting it.

Sanai continues to accuse the JC of past misconduct, which is now confirmed by a ruling of an impartial tribunal.

94.     The failure of the JC to police Kozinski resulted in the formation of a working group to provide changes to the rules of judicial conduct and the rules for application of the JCDA.  Sanai appeared at the public hearing on behalf of himself and Mecham to explain the fatal flaws in the rules as amended, and there was a blizzard of other comments and criticisms, all of which were ignored.

95.     One leading presidential candidate, Senator Elizabeth Warren, has made reform of the judicial misconduct rules a platform of her campaign, identifying the handling of judicial misconduct complaints against Kozinski as examples of governmental misconduct that must be corrected.

96.     The investigation against Kozinski terminated when he resigned from the bench.  However, the Censure Order against Sanai, which injured him personally, and the efforts to disbar him, are a continuing dispute between Sanai and the JC which can be the subject of declaratory relief.  Sanai has a constitutionally-protected right to a name-clearing hearing to vindicate his professional reputation.

97.     There is an actual controversy between Sanai, on the one hand, and the JC and Kozinski on the other hand, regarding the facts in his misconduct complaint and the facts that would have been revealed if his complaint had been transferred to the Third Circuit Judicial Council.   Sanai is entitled to a declaratory judgment which fully sets out the history of Kozinski's sexual harassment, the enablement of it by the JC, Catterson, and other members of the Ninth Circuit Court of Appeals and District Court within the Ninth Circuit, and retaliatory conduct by Kozinski, the JC, Catterson and others that was conducted against Mecham, Walter, Sanai, Hakala and others.  This declaratory judgment must also state the facts concerning Kozinski's perjury before the Third Circuit Judicial Council.  Sanai is also entitled to a declaratory judgment setting out that the facts alleged in his misconduct complaints are true, or, to the extent they are not accurate, the actual facts.  This

declaratory judgment is in the public interest.  Once findings of fact setting out the true and complete history have been made, the JC should be ordered to publish and publicize the judgment in place of the Censure Order.

98.    Sanai is also entitled to a declaratory judgment that the filing and prosecution of the state bar complaint by the JC, and any administrative decisions of the JC that permit such conduct, are outside the jurisdiction of the JC.

## FOURTH COUNT
### ABUSE OF PROCESS (FEDERAL COMMON LAW)

(By Sanai as Against Kozinski, Catterson and the 2010 JC Defendants)

99.    Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

100.    Kozinski, Catterson and the 2010 JC Defendants utilized the judicial misconduct law to impose injury on Sanai (i) where the actual statute did not grant subject matter jurisdiction to impose sanctions or punishment on a complainant by the administrative agency in question, the JC; (ii) where the JC defendants had a non-discretionary duty to transfer the complaints to the Third Circuit Judicial Council; and (iii) where the misconduct proceedings were utilized to protect Kozinski from inquiry about this use of pornography to sexually harass his clerks, which practices of Kozinski were known to the 2010 JC Defendants.  The abuse of process continues to this day because Defendant Thomas refused to process the motion to vacate the Censure Order, which is still in limbo.  Their conduct constituted abuse of process under federal common law, which applies because the process in question is federal and thus constituted issues involving the rights and obligations of an agency of the United States.

101.    The 2010 JC Defendants are not entitled to judicial immunity because the acts they committed did not constitute performance of duties of a judge of any United States District Court or the Ninth Circuit Court of Appeals.  "Fundamentally,

however, misconduct proceedings are inquisitorial and administrative." *In re Manuel Real, supra.*  Administrative agency personnel are entitled to qualified immunity from constitutional and federal law claims to the extent that their activities arise from performance of their duties within their jurisdiction, and their conduct does not violate clearly established law.

102.   By no later than 2008 it was clearly established law that judicial misconduct proceedings were inquisitorial administrative proceedings that have no justiciable constitutional due process protections.  Given that federal judges have no justiciable due process rights to retain their positions, this is constitutional AS TO JUDGES.  However, it is and was manifestly unconstitutional to use judicial misconduct proceedings to punish complainants, who have no due process rights such as right to an impartial tribunal, right to see evidence obtained in investigations, or even right to review the evidence used against them.

103.   In addition, it was clearly established law that the JC had to obey Justice Roberts' transfer order of the judicial misconduct complaints of Sanai and Mecham; by refusing to do so, the 2010 JC Defendants, Kozinski  and Catterson lacked subject matter jurisdiction in respect of Sanai's complaint.

104.   Sanai is entitled to monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the abuse of process by Catterson, Kozinski and the 2010 JD Defendants.  The actions of Kozinski, Catterson, and the 2010 JC Defendants were taken maliciously and with the explicit intention of violating Sanai's constitutional rights, to oppress him, and to make his disbarment a warning to anyone who sought to blow the whistle on Kozinski or other judges in the Ninth Circuit, so imposition on punitive damages on each is merited.

# FIFTH COUNT

## MALICIOUS PROSECUTION  (FEDERAL COMMON LAW)

(By Sanai as Against Kozinski, Catterson and the 2010 JC Defendants)

105.   Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

106.   The 2010 JC Defendants utilized the judicial misconduct law to impose injury on Sanai where the actual statute did not grant subject matter jurisdiction to impose sanctions or punishment on a complainant by the administrative agency in question, the JC; where the 2010 JC Defendants had a non-discretionary duty to transfer the complaints to the Third Circuit Judicial Council; and where the misconduct proceedings were utilized to protect Kozinski from inquiry about this use of pornography to sexually harass his clerks, which practices of Kozinski were known to the 2010 JC Defendants.  Their conduct constituted malicious prosecution under federal common law, which applies because the JCDA is a federal law.

107.   The 2010 JC Defendants and Kozinski are not entitled to judicial immunity because the acts they committed did not constitute performance of duties of a judge of any United States District Court or the Ninth Circuit Court of Appeals. "Fundamentally, however, misconduct proceedings are inquisitorial and administrative." *In re Manuel Real, supra.*  Administrative agency personnel are entitled to qualified immunity from claims under the United States constitution or federal law to the extent that their activities arise from performance of their duties within their jurisdiction, and their conduct does not violate clearly established law.

108.   By no later than 2008 it was clearly established law that judicial misconduct proceedings were inquisitorial administrative proceedings that, like impeachment and removal by Congress, have no justiciable due process protections. Given that federal judges have no justiciable due process rights to retain their positions, this is constitutional AS TO JUDGES.  However, it is and was manifestly unconstitutional to use judicial misconduct proceedings to punish complainants,

who have no due process rights such as right to an impartial tribunal, right to see evidence obtained in investigations, or even right to review the evidence used against them.

109.    In addition, it was clearly established law that the JC had to obey Justice Roberts' transfer order of the judicial misconduct complaints of Sanai; by refusing to do so, the 2010 JC Defendants lacked subject matter jurisdiction in respect of Sanai's complaint.

110.    Sanai is entitled to monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the abuse of process by Kozinski, Catterson, and the 2010 JD Defendants.  The actions of Kozinski, Catterson, and the 2010 JC Defendants were taken maliciously and with the explicit intention of violating Sanai's constitutional rights, to oppress him, and to make his disbarment a warning to anyone who sought to blow the whistle on Kozinski or other judges in the Ninth Circuit, so imposition on punitive damages on each is merited.

## SIXTH COUNT

### WRONGFUL USE OF ADMINISTRATIVE PROCEEDINGS
### (CALIFORNIA LAW)

(By Sanai as Against Kozinski, Catterson, and the 2010 JC Defendants)

111.    Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

112.    Catterson, and the 2010 JC Defendants, along with the participation of Kozinski, wrongfully initiated a California attorney disciplinary  proceeding against Sanai.  Catterson, the 2010 JC Defendants, and Kozinski were actively involved in bringing and continuing the bar complaint.  The OCTC did not conduct an independent investigation of the complaint brought by Catterson on behalf of the 2010 JC Defendants and Kozinski acting as the JC.  This was because Catterson,

Kozinski and the 2010 JC Defendants refused to provide any supporting evidence, and convinced the OCTC that it was incumbent on them, if they wished to have productive legal careers, to bring meritless and harassing charges against Sanai. There was no legal barrier to conducting an independent investigation of the charge—all it required was a subpoena of the relevant records of the JC.

113.   No reasonable person in the position of the 2010 JC Defendants, Catterson and Kozinski would have believed that there were reasonable grounds to bring the proceedings or make the complaint against Sanai.   They knew Sanai's accusations against Kozinski and other judges were true and valid.  The 2010 JC Defendants, Catterson and Kozinski were informed that the proceedings would fail unless evidence was provided; but the  2010 JC Defendants, Catterson and Kozinski knew that the judicial misconduct complaint filed by Sanai was meritorious, and given an opportunity Sanai could prove all of his allegations, so they caused the OCTC  to eschew any independent investigation.  Kozinski, Catterson, and the 2010 JC Defendants acted primarily with a purpose other than succeeding on the merits of the complaint; their goal was to retaliate against Sanai for blowing the whistle, and to discourage Kozinski's many other victims from doing the same.

114.   The bar proceedings would not have occurred but for the actions of the 2010 JC Defendants, Catterson and Kozinski, and thus were a substantial factor in their occurring.  Sanai suffered harm because of them.

115.   California's statutory litigation privilege and a privilege specific to bar complaints prohibit all liability for making complaints or giving information in judicial, administrative and other official proceedings (including the State Bar) unless the  requirements of malicious prosecution are met.   *See* Judicial Council of California, California Civil Jury Instructions, CACI 1500 et. seq. (2017), in particular CACI 1502 and cases cited therein.   This is the exceptional situation where  the OCTC failed to conduct an independent investigation of the charge to obtain the information necessary to prevail; moreover, the barrier to investigation

was the refusal of the complainant to provide the relevant evidence, because such evidence would have exonerated Sanai.  Kozinski and the 2010 JC Defendants are not entitled to judicial immunity because the acts they committed did not constitute performance of judicial duties of a judge of any United States District Court or the Ninth Circuit Court of Appeals.  "Fundamentally, however, misconduct proceedings are inquisitorial and administrative." *In re Manuel Real, supra.*  Administrative agency personnel are entitled to qualified immunity to claims under federal law and the United States Constitution to the extent that their activities arise from performance of their duties within their jurisdiction, and their conduct does not violate clearly established law. This count arises under California law, so qualified immunity does not apply.  In addition, the act taken herein, the filing of a complaint with the California Bar Association, is not an act within the administrative jurisdiction of the JC or a matter to which federal law pre-empts state law; anyone can file a bar complaint.  Accordingly, there is no immunity, qualified or not, arising under federal law.

116.    Even if qualified immunity did apply to state law claims, the immunity does not apply here. It was clearly established law, set out in CACI 1502 and the cases cited therein, that a person may not make a meritless complaint about an attorney to the California bar, then escape liability if the Bar fails to investigate the charge independently.  In addition, it was clearly established law that Sanai had the right to compel witnesses and obtain evidence to defend himself in his bar trial. Catterson, on behalf of herself (as Clerk) and Kozinski and the 2010 JC Defendants, refused to comply with Sanai's trial subpoenas on the grounds, *inter alia,* that Sanai could not compel the production of records or testimony of Catterson or any judges under FEDERAL law because their testimony is inadmissible.  This position was frivolous; federal judges regularly testify in bar hearings in every state.  *See, e.g. Comm'n for Lawyer Discipline v. Cantu,* Tex. Sup. Ct. No. 18-0879 (October 25, 2019) (per curiam)(federal judge who was presiding in case from which misconduct

arose competent to testify).  It was also clearly established law that Sanai's due process rights override any evidentiary issues or privilege under FEDERAL law, because the relevant law of privilege and evidence were CALIFORNIA law. Moreover, it was clearly established law that by making the complaint, Catterson, Kozinski and the 2010 JC Defendants necessarily waived all claims of confidentiality as to records in their possession and in possession or control of the JC that could exonerate Sanai.

117.   Sanai is entitled to monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the abuse of process by Kozinski, Catterson, and the 2010 JC Defendants.  The actions of Kozinski, Catterson, and the 2010 JC Defendants were taken maliciously and with the explicit intention of violating Sanai's constitutional rights, to oppress him, and to make his disbarment a warning to anyone who sought to blow the whistle on Kozinski or other judges in the Ninth Circuit, so imposition on punitive damages on each is merited.

## SEVENTH COUNT
### *BIVENS* COMPLAINT FOR DAMAGES

(By Sanai as Against Kozinski, Catterson, and the 2010 JC Defendants)

118.   Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

119.   A person carrying out executive or administrative functions of the federal government may be sued for damages for violations of constitutional rights under a *Bivens* claims.  In order to assert a new breed of *Bivens* claim, a party must show the following:

A.   the plaintiff has a constitutionally protected right under the Fourth, Fifth, or Eighth Amendments;

B.   the defendant, a federal official, violated that right;

C. the plaintiff lacks a statutory cause of action, or an available statutory cause of action does not provide monetary compensation against the defendant;

D. no "special factors" suggest that the court should decline to provide the judicial cause of action and remedy, and

E. no appropriate immunity can be raised by the defendant.

120. "When a party seeks to assert an implied cause of action under the Constitution, separation-of-powers principles should be central to the analysis. The question is whether Congress or the courts should decide to authorize a damages suit….. Most often it will be Congress…." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1848 (2017).   Here, the separation of powers problem does not exist.  The determination of judicial or executive liability for violation of constitutional rights is completely a creation of the judiciary; what Congress writes in statutes is ignored.  Indeed, when Congress created a remedy for damages of violation of rights under color of state law—42 U.S.C. §1983—the federal courts simply over-rode the clear statutory language and held that judges continued to have immunity from damages!  Here, Sanai is demanding that a remedy be created by judges to impose liability on judges acting in an executive or administrative role for taking retaliatory measures against private parties who blow the whistle on judges who are committing unquestionable judicial misconduct.  Congress never had reason to create a damages remedy in favor of third parties for the simple reason that the JCDA never authorized the Judicial Councils or Judicial Conference to impose sanctions or penalties on complainants in any way, and neither the model rules nor the rules utilized by the JC have such provisions either.   Where an administrative agency grossly and intentionally expands its jurisdiction to areas manifestly outside the statutory subject matter jurisdiction, Congress would never create a damages remedy, since there is no reason it would anticipate such conduct, or be able to craft a statutory remedy that would anticipate the expansion.

121.   Kozinski, Catterson, and the 2010 JC Defendants utilized the judicial misconduct procedures to impose injury on Sanai where the actual statute did not grant subject matter jurisdiction to impose sanctions or punishment on a complainant by the administrative agency in question, the JC; where the 2010 JC Defendants had a non-discretionary duty to transfer the complaints to the Third Circuit Judicial Council that they breached; and where the misconduct proceedings were utilized to protect Kozinski from inquiry about this use of pornography to sexually harass his clerks, which practices of Kozinski were known to Catterson and the 2010 JC Defendants.  The imposition of a Censure Order via a process that lacked the basics of fundamental due process violated Sanai's constitutional rights under the Fifth and Eighth Amendment.

122.   In this situation a *Bivens* cause of action, like 42 U.S.C. §1983, is closely analogous to both malicious prosecution and abuse of process.   *Wyatt v. Cole,* 504 U. S. 158, 164 (1992).

123. Sanai is entitled to monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the abuse of process by Kozinski, Catterson, and the 2010 JD Defendants.  The actions of Kozinski, Catterson, and the 2010 JC Defendants were taken maliciously and with the explicit intention of violating Sanai's constitutional rights, to oppress him, and to make his disbarment a warning to anyone who sought to blow the whistle on Kozinski or other judges in the Ninth Circuit, so imposition on punitive damages on each is merited.

**EIGHTH COUNT**

**RELIEF UNDER THE CALIFORNIA PUBLIC RECORDS ACT AND
INJUNCTIVE RELIEF TO ENSURE**

(By Sanai as Against the Judicial Council of California)

124.   On March 4, 2019, March 20, 2019, and December 3, 2019, Sanai made public record requests regarding administrative records concerning, inter alia, the Judicial Council of California's letter in 2014 stating that Justice Dennis Perluss would refuse to comply with a subpoena to appear at the bar trial.   The Judicial Council of California responded to all three  requests with only a partial disclosure of relevant documents and stated that as to certain requests that responsive documents would not be provided.  These documents would be used in Sanai's upcoming bar trial, or be useful in identifying other documents that could be obtained by subpeona.

125.   Sanai is entitled to an order under the California Public Record Act and California Rule of Court 10.500 to an order releasing all documents requested, which include, without limitation, all documents which refer, relate or pertain to Sanai, and all documents which refer, relate or pertain to litigation or proceedings specified therein.  Sanai is further entitled to public disclosure of all documents which are or may be exculpatory or offer a defense to the remaining state bar charges, including documents which would in the mind of a reasonable person show an unconstitutionally unacceptable risk that judges or justices who are or have been members of the Judicial Council of California are biased against Sanai.

# NINTH COUNT

## INJUNCTIVE RELIEF AGAINST VIOLATION OF CONSTITUTIONAL RIGHTS

### (By Sanai as Against Does 1-10)

124.   Sanai hereby incorporates by this reference paragraphs 1 through 76 as if set forth in full.

125.   Does 1-10 are state and federal judicial officers, employees and organizations which have information and documents relevant to Sanai's defense in his resumed bar trial.  Sanai has a constitutional right to obtain their documents and compel their presence at this trial.  On information and belief, Sanai alleges that such persons and organizations will frustrate Sanai's right to compel witnesses and testimony because of the embarrassment and the professional injury it will cause them when the truth is revealed.  It is also possible that their identity, influence and position in the state and federal judiciary may cause a California Superior Court judge or appellate justice to refuse to enforce a subpoena against them.

126.   The need for such discovery was proximately caused by the actions of the 2010 JC Defendants and Catterson.  But for their tortious conduct alleged above, no bar proceeding would have been initiated against Sanai.  Accordingly, obtaining the judicial assistance of this Court in forcing recalcitrant witnesses to submit to depositions and appear at Sanai's bar trial  and to furnish documents is necessary and appropriate relief.  It is a certainty that Judge Kozinski will use every resource at his command to fight this lawsuit and retaliate against Sanai.  Kozinski's modus operandi for retaliation in the past has been through himself and through proxies, who included the late Stephen Reinhardt, Catterson and even the JC itself.  On information and belief, Sanai alleges that such unknown persons are currently conspiring to impair Sanai's rights, and will do so once subpoenas are either issued or sought to be enforced; such persons by virtue of their participation in the conspiracy are included as Does 1-10.

127.   The identities of the persons who will seek to frustrate Sanai's constitutional right to a fair trial are not known and will not be known until they take overt action.

128.   Once identified and a Doe amendment is made, Sanai will be entitled to injunctive relief to compel the production of documents and presence of Does 1-10 at depositions and his bar trial.

**WHEREFORE,** Plaintiff Cyrus Sanai respectfully demand the following relief on behalf of himself:

<u>On the First Count</u>

1.   A mandatory injunction that all Defendants should provide to Sanai all documents that they possess, own or control (including emails and telephonic messages) that:

A.   Refer, relate or pertain to Sanai;

B.   Refer or relate to any litigation referenced in his misconduct complaints filed with JC;

C.   Refer relate or pertain to the interactions between Catterson and OCTC and Catterson and Kozinski;

D.   Refer, relate or pertain to Kozinski's battle over the firewall;

E.   Refer, relate or pertain to Kozinski's treatment of his clerks;

F.   Refer, relate or pertain to the misconduct complaints made or identified against Kozinski and other judges herein; and

G   Refer, relate or pertain to retaliatory conduct instigated by Kozinski, and any of the 2010 JC Defendants  against Sanai, Mecham or any other persons acting on behalf of them or the JC.

2.   A prohibitory injunction barring the Current JC Judges and Collins from participating as a judge or justice in any way in a matter involving Sanai, as party or attorney.

3.    A prohibitory injunction barring the JC from imposing any kind of sanction or penalty on any judicial misconduct complainant.

4.    A mandatory injunction on the JC requiring it to promulgate effective rules and procedures requiring judges in the Ninth Circuit to fully disclose past and current relationships between the judges in which the case is proceeding and lawyers, law firms, identified witnesses, and parties in the case as and when the identity of each such lawyers, law firms, identified witnesses, and parties is disclosed to the judge.

5.    Reasonable costs incurred in this action.

On the Second Count

1.    An injunction vacating the Censure Order and barring the JC from imposing any kind of sanction or penalty on any judicial misconduct complainant.

2.    Reasonable costs incurred in this action.

On the Third Count

1.    After full discovery and provision of the documents identified above, a trial in which Court will enter a declaratory judgment which fully sets out the history of Kozinski's sexual harassment, the enablement of it by the JC, Catterson, and other members of the Court, and retaliatory conduct by Kozinski, the JC, Catterson and others that was conducted against Mecham, Walter, Sanai, Hakala and others.  This declaratory judgment shall also set out the   facts alleged in his misconduct complaints as true, or, to the extent they are not accurate, the actual facts.

2.    Reasonable costs incurred in this action.

On the Fourth Count

1.    Monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the abuse of process by Kozinski, Catterson and the 2010 JD Defendants in the amount of at least $10,000,000.00, plus punitive damages.

2.       Reasonable costs incurred in this action.

<u>On the Fifth Count</u>

1.       Monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the malicious prosecution by Kozinski, Catterson and the 2010 JD Defendants in the amount of at least $10,000,000.00, plus punitive damages.

2.       Reasonable costs incurred in this action.

<u>On the Sixth Count</u>

1.       Monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the wrongful use of administrative proceedings by Kozinski, Catterson and the 2010 JD Defendants, in the amount of at least $10,000,000.00, plus punitive damages.

2.       Reasonable costs incurred in this action.

<u>On the Seventh Count</u>

1.       Monetary damages for emotional injury, lost income and opportunities to obtain income, reputational injury and out-of-pocket expenses arising from the retaliatory misconduct committed by Kozinski, Catterson and the 2010 JD Defendants in the amount of at least $10,000,000.00, plus punitive damages.

2.       Reasonable costs incurred in this action.

<u>On the Eighth Count</u>

1.       An order disclosing all documents requested by Sanai from the Judicial Council of California; and

2.       Reasonable costs and attorneys fees incurred in this action.

<u>On the Ninth Count</u>

1.       Injunctive Relief against Does 1-10.

2.       Reasonable costs incurred in this action.

1

2

Dated:          December 16, 2019

3                                    By:  _/s/__   Cyrus Sanai

4                                             CYRUS SANAI
                                              In pro per.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT